## EAST ALABAMA RAILWAY COMPANY *v.* DOE *ex dem.* VISSCHER.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF ALABAMA.

Argued March 20, 1885.—Decided April 13, 1885.

Various owners of lands in Alabama granted to a railroad corporation of that State, "and its assigns," in 1860, a right of way through the lands, to make and run a railroad, the corporation having a franchise to do so and to take tolls ; and it obtained a like right, as to other land, by statutory proceeding. It graded a part of the line. V., a judgment creditor of the corporation, in 1867, levied an execution on the right of way, and it was sold to V., and the sheriff deeded it to him, and he took possession of the road-bed. In 1870, he contracted with another railroad corporation to complete the grading of the line of road for so much per mile, and, on being paid, to transfer to it all his title to the franchise, right of way and property of the old corporation. He completed the work, and was not paid in full, but gave possession of the road, in 1871, to the corporation, and its franchises and road and property passed, in 1880, to another corporation, the defendant, against whom V. brought an action of ejectment, to recover the road-bed : *Held*,

(1.) The right of way could not be sold on execution, or otherwise, to a purchaser who did not own the franchise ;
(2.) There was nothing in the contract to estop the defendant from disputing the right of V. to recover in ejectment, on the strength of his title ;
(3.) V. could not recover.

This was an action of ejectment. The facts which make the case are stated in the opinion of the court.

*Mr. Edward Patterson* and *Mr. H. C. Semple* for plaintiff in error.

*Mr. John T. Morgan* and *Mr. Samuel F. Rice* for defendants in error.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

In November, 1880, the defendants in error brought an action of ejectment, in the Circuit Court of Chambers County, Alabama, against the East Alabama Railway Company, to recover premises described in the complaint as follows: "A certain tract or parcel of land, being the railroad bed of the railroad formerly known and called the East Alabama and Cincinnati Railroad, from Lafayette to the county line of Lee County, together with all the land contiguous to said road-bed, on each side thereof, to the distance of 75 feet from the centre thereof, said railroad being now known and called as the East Alabama Railway, with the appurtenances, situate in the county of Chambers aforesaid." Lafayette is in Chambers County, and Lee County lies south of Chambers. The suit was duly removed by the company into the Circuit Court of the United States for the Middle District of Alabama. It was tried before a jury, in December, 1881, on a suggestion that the company had been in adverse possession of the premises for more than three years before the bringing of the suit, and had made permanent and valuable improvements by building a railroad thereon, and on the plea of not guilty. The jury found for the plaintiffs "for all the property described in the complaint," and assessed their damages at $3,963.40, and there was a judgment accordingly. The company brings a writ of error.

The bill of exceptions sets forth all the evidence in the cause.

The following are all the facts which it is needful to state : The Lafayette Branch Railroad Company was incorporated by the Legislature of Alabama, February 7, 1848, to construct a railroad from Lafayette to intersect or connect with the Montgomery and West Point Railroad at some suitable point between Chehaw and West Point. By an amendatory act of April 9, 1854, the company was authorized to extend its road beyond Lafayette in the direction of the Tennessee River, and to connect the same with any railroad built, or being built, or to be built, so as to connect with some point on the Tennessee River. By an amendatory act of January 25, 1860, its name was changed to the Opelika and Oxford Railroad Company, and it was authorized to connect its road with the Alabama and Tennessee River Railroad at or near Oxford, Calhoun County. The companies were successively organized. In 1861 one Richards was elected president. The Opelika and Oxford Company acquired the right of way through the lands of all the proprietors of the soil, from a point on the Montgomery and West Point Railroad, about two miles northerly from Opelika, in Lee County, to Lafayette, by deeds from all the proprietors (save in one case). The deeds, except in the description of the land through which the road was to pass, were all in the form of the following one :

"*Mary F. McLemore to Opelika and Oxford R. R. Co.*
ALABAMA, *Chambers County* :

This indenture, made this 31st day of August, in the year of our Lord one thousand eight hundred and sixty, between Mary McLemore, of Chambers County, of the one part, and the Opelika & Oxfor R. R. Company, of the other part, witnesseth : That the said Mary F. McLemore, for and in consideration of the sum of one dollar to her in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, doth give, grant, bargain, and sell unto the said railroad company, and their successors and assigns, the right of way over which to pass at all times by themselves, directors, officers, agents, hirelings, and servants, in any manner they may think proper, and particularly for the

purpose of running, erecting, and establishing thereon a railroad with requisite number of tracks; and to this end the limit of said right of way shall extend in width fifty feet on each side of the slope stake of the right of way of the said railroad when completed, and to extend in length through the whole tract of land owned and claimed by said Mary F. McLemore, and known as the north half of section 23, township 22, of range 26, situated, lying, and being in Chambers County, adjoining lands of James F. Dowdell, Evan G. Richards, and Nolan J. Wright, and running in such direction through said tract of land as the said Opelika & Oxford Railroad Company, by their engineers, shall think best suited for the purpose of locating and establishing their works; and connected with the said right of way, the said company shall have the right to cut down and remove all such trees, underwood, and growth, and timber on each side of said road as would, by falling on or striking the same, injure the rails or other parts of said road, together with all and singular the rights, members, and appurtenances to the said strip, tract, or parcel of land being, belonging, or in any wise appertaining, and, more especially, the right of way over the same; to have and to hold the same unto the said Opelika & Oxford R. R. Company, their successors and assigns, to their own proper use, benefit, and behoof forever, in fee-simple; upon condition, and it is expressly understood, that should the said railroad contemplated as aforesaid be not located and established on and along said strip, parcel, or tract of land described in the above and foregoing indenture, then said indenture is to be wholly null and void and of no effect; and the said Mary F. McLemore, her heirs and assigns, will warrant and defend the title thereof unto the Opelika & Oxford Railroad Company, their successors and assigns, against the claims of all persons whatsoever. In witness whereof the said Mary F. McLemore hath hereunto set her hand and seal the day and year first above written.

MARY F. McLEMORE."

As to the excepted case, which related to a section of land, one mile square, in Chambers County, through which the road-

bed sued for runs in that county, the company caused the same character of rights and right of way through that section of land, as was conveyed by the deeds referred to, to be condemned for its use under statute authority, and the sum assessed was finally paid to the owner. In 1860, the company employed engineers, who laid out and staked off the full right of way conveyed through all of the lands, and cut out the width through woods; and it made contracts with contractors for the grading and culverting of a railroad along the right of way, who built for it a great deal of such grading and culverting; and all the work done was done on the right of way thus staked out, but no other work was done on it except such culverting and grading, and this was not continuous through the whole line in Chambers County sued for, but there were several intervals where no work of grading and culverting was done; and the company was in the undisturbed possession of the whole of the right of way.

The company became embarrassed for want of means during the war, and ceased, before July, 1861, to do any work on the line, leaving it incomplete as to grading and culverting, and no work was done by it afterwards on the line. Richards, as late as 1863, removed, at a small expense to himself individually, some logs which had lodged in one of the culverts, to save the culvert and grading from injury, and he looked over the work from time to time. No meeting of the directors or stockholders was held after July, 1861, and no corporate act was done by either after that date. The company was without means to prosecute the building of the road any further.

One Lockett and the firm of D. W. & J. G. Visscher were contractors, to whom the company was indebted for work on the line. Lockett recovered one judgment and the Visschers another against the company, October 26, 1866, in a court of the State, by service of process on Richards, as president, the former for $14,457.21, and the latter for $12,383.83. An execution was issued on each judgment to the sheriff of Chambers County, November 7, 1866, and levied on that day, according to the return on each writ, on a house and lot, and also on "the right of way to the Opelika and Oxford Railroad, so far as the

right of way has been obtained, and all the appurtenances belonging to said railroad company, from Lafayette to the edge of Lee County, and also the surveying instruments belonging to said company." The plaintiffs' attorney stopped proceedings on those executions on the 12th of April, 1867. A second execution was issued on each judgment to said sheriff, May 8, 1867, and levied on that day, under the Lockett execution, according to the return thereon, on a house and lot, and also on " the right of way to the Opelika and Oxford Railroad, so far as the right of way has been obtained, to the edge of Lee County, and also all the surveying instruments belonging to said company ; " and under the other execution, according to the return thereon, on the same property, omitting the words " the right of way has been obtained, to." After a sale, the sheriff executed the following deed to the purchasers:

" This indenture, made and entered into this 3d day of June, 1867, between R. J. Kellam, sheriff of the County of Chambers, in the State of Alabama, of the one part, and D. W. & J. G. Visscher and A. L. Woodward, of the other part, witnesseth : That whereas, on the 26th day of October, 1866, a judgment was duly rendered in the Circuit Court for the County of Chambers, in the State aforesaid, at the fall term of the said Court, for the sum of twelve thousand three hundred and eighty-three dollars, and costs, in favor of Abner M. Lockett, and one in favor of D. W. & J. G. Visscher, for fourteen thousand four hundred and fifty-seven dollars and twenty-one cents, and against the Opelika and Oxford Railroad Company, on which said judgments there was issued by the clerk of the Circuit Court for said county, on the 8th day of May, 1867, certain writs of *fieri facias* in favor of said Abner M. Lockett and D. W. & J. G. Visscher, and against the said railroad company, directed to any sheriff of the State of Alabama, whereby such sheriff was directed to levy of the estate, &c., of said railroad company, and make the said sum of twenty-six thousand seven hundred and fifty-one $\frac{4}{100}$ dollars, besides costs, and which said writ was, on the 8th day of May, 1867, placed in the hands of the said R. J. Kellam, as sheriff of said County of Chambers,

for the purpose of its levy and execution; and whereas said R. J. Kellam, as sheriff as aforesaid, after the said writ had come into his hands, and while the same was in full force, did, on the 8th day of May, 1867, levy the same on the following tract or lot of land, as the property of the said railroad company, to wit: The right of way to Opelika and Oxford Railroad Company, so far as the right of way has been obtained, from Lafayette, to the line of Lee County, and all the appurtenance from Lafayette to the line of Lee County, lying and being in said County of Chambers; and whereas the said R. J. Kellam, as sheriff as aforesaid, after having duly advertised the said tract of land or railroad bed for sale in the mode prescribed by law, did, in accordance with said advertisement, on the 3d day of June, 1867, at the court-house, in the town of Lafayette, proceed to sell the same, under and by virtue of said writ of *fieri facias*, and the said D. W. & J. G. Visscher and A. L. Woodward, having bid for the said land or railroad bed, then and there selling as aforesaid, the sum of five hundred dollars, and it being the highest and best bid that could then and there be got for the same, he, the said sheriff, did therefore sell and cry off the tract of land or railroad bed, to the said D. W. & J. G. Visscher and A. L. Woodward. Now, therefore, in consideration of the premises, the said party of the first part, as sheriff of the said County of Chambers, has and does hereby bargain and sell, alien and convey, unto said D. W. & J. G. Visscher and A. L. Woodward, the said tract of land or railroad bed, to wit, the right to the Opelika and Oxford Railroad, so far as the right of way has been obtained, from Lafayette to the edge of Lee County, and all the appurtenances belonging to said road from Lafayette to the line of Lee County, to have and to hold the aforesaid premises and land, together with all and singular [its] appurtenances thereunto belonging, to the said Opelika and Oxford Railroad Company, and to their heirs and assigns, forever. And said party of the first part, as sheriff as aforesaid, does covenant with the said party of the second part that he, as sheriff as aforesaid, will warrant the title of said —— to said party of the second part so far only as he by virtue of his office is authorized to

do ; but it is expressly understood that said R. J. Kellam, sheriff, is in no event to be individually liable for anything herein contained.

In testimony whereof, the said party of the first part has signed, sealed, and delivered this deed on the day it bears date.

ROBERT J. KELLAM,
*Sheriff of Chambers County, Alabama.*"

After the sheriff's sale Richards abandoned or turned over to the purchasers the line of culverting or grading, as far as he could do so, that is, he exercised no further authority over it, and the Opelika and Oxford Railroad Company made no further claim to it. On the 6th of April, 1870, D. W. and J. G. Visscher entered into a written contract with the Eufaula, Opelika, Oxford and Guntersville Railroad Company, which was signed on behalf of that company by one Pennington, as its president, and was recognized and acted on by it. Its name was afterwards changed to the East Alabama and Cincinnati Railroad Company. The two companies were one and the same corporation, chartered by Alabama to build a railroad from Eufaula to Guntersville via Opelika and Oxford. In the fall before the contract was entered into, D. W. Visscher was invited by Pennington to see him as to whether Pennington's company could not arrange to purchase for its line Visscher's grading and right of way from said junction to Lafayette. Pennington told Visscher he could build by the side of Visscher's line, but would like to purchase it ; and they agreed that the Visschers should go to work completing the grading, and that Pennington's company would furnish the means to pay for the work as it progressed. The work was begun, with the verbal understanding that the written contract should be executed, and it went on till that contract was executed, and then under the contract till the Visschers completed it to Lafayette, over the right of way or line described in the deeds therefor, and the company accepted it as done according to the contract, about May 3, 1871.

By the terms of the contract it was agreed that the Visschers should "form, prepare and finish the clearing and grubbing,

grading, masonry, trestle-work, cattle-guards, road and farm crossings, track laying, including switches, frogs and turn-outs, three warehouses, three water-tanks, with fixtures complete, including the furnishing of materials and all other things requisite and necessary to complete the road ready for the running of trains, except the iron materials which go into the super-structure of the road," from Opelika, or two miles north thereof, as the company should elect and designate, for a distance of twenty miles, to a point beyond Lafayette. The contract specified the terms of compensation, and provided that on the completion of the twenty miles, and the payment of the amount of the contract, D. W. Visscher should transfer to the company "all right and title vested in him to all franchises, right of way or other property belonging to, or pertaining to. the said road, under the old organization known as the Opelika and Oxford R. R." The Visschers were not paid the full amount due to them for the work done under the contract, and claimed that there was due to them more than $100,000.

Under a decree of sale made in a suit for the foreclosure of a mortgage made by the East Alabama and Cincinnati Railroad Company, Edward Livingston and Richard Irvin, Jr., purchased, and received from the proper officer, on the 19th of April, 1880, a deed of the "entire corporate property of, or belonging to, the East Alabama and Cincinnati Railroad Company, used for railway purposes, and all and singular the entire railroad of said company, extending from Eufaula, Alabama, to Guntersville, Alabama, being about two hundred and twenty miles in length, at present unfinished, its entire franchises and privileges, held and acquired, together with the right of way, road-bed, road, . . . and all its ways and rights of way," &c. The plaintiff in error became a corporation, under the laws of Alabama, on the 28th of May, 1880, and, on the 13th of July, 1880, Livingston and Irvin conveyed to it the property so deeded to them, by the same description.

At the trial, the plaintiffs offered in evidence transcripts of the proceedings as to the said judgments, executions, levies, sale, and sheriff's deed. The defendant objected to each of them "as illegal and irrelevant evidence, and also because they

tended to show the sale under execution and conveyance by
the sheriff of an easement alone, not the subject of an eject-
ment." The court overruled each of the objections and allowed
each of the transcripts to be read in evidence, and the defend-
ant excepted separately to each of the rulings.

After the close of the testimony the court charged the jury
that if they believed from the evidence that the company be-
fore named entered into the written contract with the Visschers,
and under that contract was let into the possession by them of
the route described in the deeds from McLemore and others,
and failed to perform its part of the contract, and the Visschers
did perform it so far as permitted by the corporation to do so,
and the corporation failed to make the full payments due to
the Visschers under the contract, the corporation, and all per-
sons claiming under it, were estopped from setting up any title
in the premises sued for adverse to the Visschers, and their
possession under the contract was not adverse.

The court also charged the jury that the property conveyed
by the deed of the sheriff was the subject of levy and sale
under execution, and that the objection made by the defendant
that it was only an easement, and not the subject of a levy and
sale under execution, was not well founded.

To each of these charges the defendant excepted. There
were exceptions to other instructions, and to refusals to charge
in accordance with requests made by the defendant; but the
questions which we regard as decisive of the case are raised by
those already mentioned.

The right which the Opelika and Oxford Company obtained
under the deeds from McLemore and others (and the right ob-
tained by condemnation is set forth as of the same character)
was described in the deeds as " the right of way over which to
pass at all times, by themselves, directors, officers, agents, hire-
lings and servants, in any manner they may think proper, and
particularly for the purpose of running, erecting and establish-
ing thereon a railroad with requisite number of tracks;" and
it was provided that, " to this end, the limit of said right of
way shall extend in width fifty feet on each side of the slope
stake of the right of way of the said railroad when completed,

and to extend in length through the whole tract of land owned and claimed" by the grantor, describing it, "and running in such direction through said tract of land" as the company, by its engineers, should think best suited for the purpose of locating and establishing its works. The grantor conveyed this to the company and its successors and assigns. The deed also provided, that "connected with the said right of way, the said company shall have the right to cut down and remove all such trees, underwood and growth and timber, on each side of said road, as would, by falling on or striking the same, injure the rails or other parts of said road, together with all and singular the rights, members and appurtenances to the said strip, tract or parcel of land being, belonging, or in anywise appertaining, and more especially the right of way over the same." The habendum was, to have and to hold the same to the company, its successors and assigns, to its "own proper use, benefit and behoof, forever, in fee simple." Then followed the further provision, that should the contemplated railroad not be located and established on and along the strip, parcel or tract of land described in the deed, the deed should be wholly null and void and of no effect.

The right granted was merely a right of way for a railroad. It was granted to an existing corporation, which had a franchise. The grant to the "assigns" of the corporation cannot be construed as extending to any assigns except one who should be the assignee of its franchise to establish and run a railroad. Nor did the mention of rights, members and appurtenances belonging and appertaining to the strip of land, or the use of the words "forever, in fee simple," enlarge what was otherwise the limited character of the grant. No fee in the land was conveyed, nor any estate which was capable of being sold on execution on a judgment at law, or separate from the franchise to make and own and run a railroad. The corporation could not have made a voluntary conveyance of the right of way, severed from its franchise. What it acquired was merely an easement in the land, to enable it to discharge its function of making and maintaining a public highway, the fee of the soil remaining in the grantor. By the terms of the

charter of the Lafayette Branch Company it was given the power to purchase, hold, lease, sell and convey real, personal and mixed property, so far as should be necessary for the purposes mentioned in the act, namely, to construct and operate the specific railroad authorized therein, with power to "lay and collect toll from all persons, property, merchandise or, other commodities transported thereon." By the terms of its charter, therefore, in connection with the terms of the deeds of the right of way, that right was indissolubly linked to the franchise, and to the purpose of the existence of the corporation, and to its public functions, so long as they should exist. It would violate not only the expressed intention of the grantors in the deeds, but the manifest purpose of the Legislature of Alabama, to permit a private person to seize and appropriate the right of way, by the purchase of anything at a judicial sale, apart from the franchise on which the right of way was dependent. The sheriff's deed purported to convey, in words, "the said tract of land or railroad bed, to wit, the right of the Opelika & Oxford Railroad, so far as the right of way has been obtained, from Lafayette to the edge of Lee County, and all the appurtenances belonging to said road from Lafayette to the line of Lee County." If the deed undertook to convey any land or soil or road-bed, it conveyed with it the right of way. The deed, in reciting the levy, states that it was made "on the following tract or lot of land, as the property of the said railroad company, to wit; the right of way," &c., and states that that was what was sold. It was not lawful for the purchasers to have a deed of the right of way, and if they obtained a deed of anything, the right of way was included, or else they received nothing beyond, perhaps, a right to carry away from the land what the company had put upon it.

The bill of exceptions states that a like right of way through the lands of the proprietors of the soil was obtained by deed, in Lee County, from a point about two miles north of Opelika to the south line of Chambers County; and that, under executions issued to Lee County on the same judgments, there were levies made on the right of way of the company so far as the same had been obtained by it up the line of Chambers

County, and a sale by the sheriff of Lee County of what was so levied on, to the same persons who bought at the sale in Chambers County. But, at the sale in Lee County a different purchaser might have bought the right of way, and there would then have been a division of the ownership of the line of the road, created as a unit and intended to remain such, resulting in a different control, with no franchise to collect toll. No such thing could be done.

The policy of the State of Alabama on this subject is indicated by the provisions of her Constitutions of 1865, Art. 1, § 25, of 1867, Art. 1, § 25, and of 1875, Art. 1, § 24: "That private property shall not be taken or applied for public use, unless just compensation be made therefor; nor shall private property be taken for private use, or for the use of corporations other than municipal, without the consent of the owner; *Provided, however*, That laws may be made securing to persons or corporations the right of way over the lands of other persons or corporations;" "but just compensation shall, in such cases, be first made to the owner." In *Alabama & Florida Railroad Co.* v. *Burkett*, 42 Ala. 83, it was held that, under this provision, a railroad company acquired no absolute title to land in fee simple, but only a right to use for its purposes. Nor is a right of way such as may be thus secured, or such as was granted by deed in the present case, within the meaning of the provision of the Code of Alabama, that executions may be levied on real property in which the defendant "has a vested legal interest, in possession, reversion or remainder, whether he has the entire estate, or is entitled to it in common with others." Code of 1852, § 2455; Code of 1867, § 2871; Code of 1876, § 3209.

We are not referred to any decision of the Supreme Court of Alabama made before the rights involved in this suit arose, or before this suit was brought, determining the questions here involved. Two unreported cases are cited by the defendants in error: *Tennessee & Coosa Railroad Co.* v. *East Alabama Railway Co.*, decided at December Term, 1883; and *Hooper* v. *Columbus & Western Railway Co.*, decided at December Term, 1884. To these cases, if they were in point, the doctrine al-

ways held by this court, and so emphatically repeated in
*Burgess* v. *Seligman*, 107 U. S. 20, would be applicable, namely,
that the courts of the United States, in the administration of
State laws in cases between citizens of different States, " have
an independent jurisdiction co-ordinate with, and not sub-
ordinate to, that of the State courts, and are bound to exercise
their own judgment as to the meaning and effect of those
laws ; " and that when contracts and transactions have been
entered into, and rights have accrued thereon, in the absence of
any authoritative decision by the State courts, the courts of
the United States " properly claim the right to adopt their own
interpretation of the law applicable to the case, although a
different interpretation may be adopted by the State courts
after such rights have accrued."

But the cases cited are not in point.   In the first one a rail-
road corporation, having a franchise, and claiming the legal
title and ownership of rights of way, and of a line of railroad,
which was being operated by the defendant, another railroad
corporation, brought ejectment to recover the property.   The
defendant corporation had a junior franchise, and claimed to
have purchased the entire property sued for, under a title
emanating from the plaintiff.   It was held that the plaintiff
could recover.   In the second case an individual having the
legal title to a strip of land through which a railroad com-
pany had been permitted by him to construct its road was
held to be entitled to recover the land in ejectment from the
company, which had failed to pay him for the right of way.

This court decided, in *Gue* v. *Tidewater Canal Co.*, 24 How.
257, that a corporate franchise to take tolls on a canal could
not be seized and sold under a *fieri facias*, unless authorized by
a statute of the State which granted the act of incorporation;
and that neither the lands nor the works essential to the enjoy-
ment of the franchise could be separated from it and sold under
such a writ, so as to destroy or impair the value of the fran-
chise.   This decision was put on the ground, that the franchise
or right to take toll on boats going through the canal would
not pass to the purchaser under the execution on a judgment at
law against the corporation, because it was an incorporeal

hereditament, and, upon the settled principles of the common law, could not be seized on a *fieri facias;* and was made in a case where the corporation owned in fee the real estate, toll houses, canal locks and wharf seized, all of which were necessary for the uses and working of the canal. But, in the view we have taken, as before stated, of the facts of this case, it is not necessary to discuss the general question as to the right to levy an execution at law on property owned by a railroad company in fee.

It is contended for the plaintiffs that the defendant is estopped from denying that they were seized in fee of the property sued for, on the ground that Richards, after the sheriff's sale, abandoned or turned over to the Visschers the line of culverting and grading, as far as he could do so, that is, he exercised no further authority over it, and the Opelika and Oxford Company made no further claim to it; that the Visschers then made the written contract with the new railroad company to construct the superstructure of the road, except as to the iron materials, for the twenty miles from in or two miles north of Opelika to a point beyond Lafayette, for a specified compensation; and that the contract provided that on the completion of the twenty miles, and the payment of the amount agreed, Visscher should transfer to the company "all right and title vested in him to all franchises, right of way or other property belonging to or pertaining to the said road under the old organization known as the Opelika & Oxford R. R." The bill of exceptions states that the defendant offered evidence tending to show that the East Alabama and Cincinnati Railroad Company was in possession of the property sued for from the time the Visschers ceased their work on it, as well as of the remainder of its line of railroad, till assignees in bankruptcy took possession of it, from whom it passed to purchasers from them, and then a receiver in the foreclosure suit took possession of it, and held it till it was sold to the persons who conveyed it to the defendant. The Visschers appear not to have been in possession from the time they ceased work. They yielded possession, but not under any provision in the contract. As to the new work done by the Visschers they became merely creditors, out of posses-

sion, with such rights as the law gave them, but certainly with no right to eject the company or its successors or grantees. They were to construct twenty miles of road for $14,750 per mile. When all was done and paid for they were to transfer what right they had to the road under the Opelika and Oxford organization. But they yielded up possession of that with the new work. As to what they obtained by the sheriff's sale and deed, they acquired nothing thereby, formerly belonging to the Opelika and Oxford company, under the name of right of way, granted to or acquired by that company, which was capable of being conveyed by them; and as to anything else, their right did not lie in ejectment. Whether they were vendors or creditors in respect to what they so agreed to transfer, it is not necessary or proper to determine in this suit. There was nothing in what occurred between the parties, or in the contract, or in the transactions under it, which estopped the defendant from disputing the right of the plaintiffs to recover in ejectment on the strength of their title.

It follows, from these views, that the Circuit Court erred in its first and third charges to the jury, and, as this conclusion goes to show that the plaintiffs had no title on which they could recover in ejectment, it becomes unnecessary to consider any of the other questions raised by the defendant.

*The judgment is reversed, and the case is remanded to the Circuit Court, with a direction to grant a new trial.*